**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| VERMIN LOVE SUPREME, an individual; <br><br> Plaintiff, <br><br> v. <br><br> THE CITY OF CONCORD; BRADLEY C. OSGOOD in his official capacity as the Chief of Police of the City of Concord Police Department; POLICE OFFICERS JOHN DOES and JANE ROES NOS. 1-4, in their individual and official capacities as employees of the City of Concord Police Department; EUGENE BLAKE in his individual and official capacity as Health and Licensing Officer at the Health and Licensing Department and/or the Code Administration Department at the City of Concord; JOHN DOES and/or JANE ROES NOS. 1-4, in their individual capacities as employees of the Code Administration Department and/or Health and Licensing Department at the City of Concord; <br><br> Defendants. | Civil Case No. 1:17-cv-670 <br><br> ***EMERGENCY EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

Plaintiff Vermin Love Supreme ("Plaintiff" or "Mr. Supreme") brings this motion on an *ex parte emergency basis* for a temporary restraining order to compel Defendants to issue him a permit to engage in public participation and First Amendment protected activities, or to enjoin Defendants from taking action against Plaintiff when he engages in such activity. This motion is made based on all pleadings and papers on file herein and the attached Memorandum of Points

and Authorities, and any further argument and evidence as may be presented at hearing.

## MEMORANDUM OF POINTS AND AUTHORITIES

### 1.0    INTRODUCTION

Plaintiff Vermin Love Supreme is a political activist and public figure who has run for various elected offices since the 1980s including President of the United States. Mr. Supreme wishes to exercise his First Amendment Right to engage in political speech by protesting outside of bookstore where former Presidential Candidate Hillary Clinton will be signing her new book on Tuesday, December 5, 2017. While his rationale may be constitutionally irrelevant, his right to do so comes into a state of heightened focus when we consider that Clinton has made a direct political attack on Mr. Supreme, and he demands the right to respond. In part Clinton's book, she makes a direct reference to Mr. Supreme's political platform, as described in more detail below, wherein he advocates socialized distribution of equine companions[1] to every American as part of his commentary on American politics.

Mr. Supreme wishes to engage in constitutionally protected political speech by protesting outside on the public pathway with two live ponies as symbols of his message. While he should need no permit, Mr. Supreme attempted to comply with government instructions to obtain permits. Despite the fact that ponies are allowed outside at the location of the protest, Defendants denied Mr. Supreme's request for a permit on the day of Mrs. Clinton's book signing, offering instead to issue a permit for the ponies on a different day in the same

---

[1]    Mr. Supreme's long standing platform has been centered on free ponies for all Americans, which would include a federal pony identification system and a law that each American must have their pony with them at all times. See *Id.*

RANDAZZA | LEGAL GROUP

location.  Mr. Supreme's message will be lost if he is not able to protest Hillary Clinton outside near the book signing.

Mr. Supreme moves to compel Defendants to issue a permit to him, or enjoin Defendants from interfering with his speech, so that he may engage in First Amendment protected activities.  Defendants' conduct is an unconstitutional prior restraint on activity that is at the core of the First Amendment, and violates the First and Fourteenth Amendments to the U.S. Constitution, as well as Arts. 15 and 22 of the New Hampshire Constitution.

Defendants' conduct is never constitutionally tolerable, but the harm caused by their actions is especially pronounced here.  Plaintiff's political speech is at the core of the First Amendment.  To chill Plaintiff's free speech, when they are directly related to political advocacy is to place the heavy boot of censorship firmly upon the throat of the noble values underlying the First Amendment.  This will not stand, and the Court should immediately remedy the unconstitutional wrong on an emergency basis by ordering that the Defendants issue a permit to Plaintiff to engage in his peaceful political protest, or in the alternative, enjoining the defendants from interfering with his planned speech.  The Defendants must be compelled to permit Mr. Supreme to engage in his political speech in a manner that will allows his message to be effective, and at a time and place that will allow his public participation to be meaningful.

## 2.0   FACTS

Vermin Love Supreme has run for President of the United States seven times. *See* Declaration of Vermin Supreme ("Supreme Decl."), attached hereto as

<u>Exhibit 1</u>, at ¶2.  Mr. Supreme has a ground swell of support in New Hampshire, and he placed fourth in New Hampshire's Democratic primary election in 2016.[2]

Part of Mr. Supreme's long standing campaign platform has centered on free ponies for all Americans.  Some voters have interpreted this as commentary, satire, and political parody about a political system that rewards candidates who promise free benefits without discussing cost or practicality.[3]  *See also* Supreme Decl. at ¶5.

Hillary Clinton ("Mrs. Clinton") is a long-serving politician and she was the 2016 Democratic Presidential Candidate; she recently wrote a book, called "What Happened" about the 2016 Presidential campaign.  *See* Hillary Clinton, *What Happened,* SIMON & SCHUSTER (Sept. 12, 2017).  In part of her book, Mrs. Clinton criticizes her main Democratic rival in the campaign, Bernie Sanders, with a passage that describes a Facebook post she agreed with:

> Bernie: "I think America should get a pony."
> Hillary: "How will you pay for the pony? Where will the pony come from? How will you get Congress to agree to the pony?"
> Bernie: "Hillary thinks America doesn't deserve a pony."
> Bernie Supporters: "Hilary hates ponies!"
> Hillary: "Actually, I love ponies."
> Bernie Supporters: "She changed her position on ponies! #WhichHillary #WitchHillary"
> Headline: HILLARY REFUSES TO GIVE EVERY AMERICAN A PONY.
> Debate Moderator: "Hillary, how do you feel when people say you lie about ponies?[4]

---

[2]  *See* Rebecca Kaplan, *Vermin Supreme finishes fourth in N.H. Democratic primaries* CBS NEWS (Feb. 10, 2016) available at <https://www.cbsnews.com/news/vermin-supreme-finishes-fourth-in-new-hampshire-democratic-primary/>

[3]  *See* Megan Specia, *A man with a boot on his head got more primary votes than Jim Gilmore in New Hampshire*, Mashable (Feb. 10, 2016) available at <http://mashable.com/2016/02/10/vermin-supreme-new-hampshire-primary/#nnczONU_UgqY>

[4]  See the full book excerpt at Madison Malone Kircher, *Because Politics in the 21st Century Is an Endless Meme War, Hillary Clinton's Book Features at Least One Viral Facebook Post*, NY Mag (Sept. 5, 2017) available at

Mr. Supreme, and his supporters, immediately understood this passage to be a direct broadside attack on Mr. Supreme's political platform, since giving every American a pony has long been associated with Mr. Supreme's political platform. *See* Supreme Decl. at ¶8. Mr. Supreme and his supporters learned that Mrs. Clinton will be giving a book signing at Gibson's Bookstore in Concord, New Hampshire. *See* Supreme Decl. at ¶9. The book signing will take place on Tuesday, December 5, 2017 at 1:00 p.m. *See* Supreme Decl. at ¶5. Mr. Supreme wishes to organize a peaceful protest outside of the book signing event to respond to Mrs. Clinton's criticism of his political platform. *See* Supreme Decl. at ¶10.

To ensure that his message is understood, Mr. Supreme procured two live ponies to bring with him to the outdoor protest, because they are symbols of his political platform. See Supreme Decl. at ¶¶10-12.

Mr. Supreme asked one of his political organizers, Keith Yurgeau ("Mr. Yurgeau"), to call the CPD to inquire about obtaining a permit for the protest on his behalf, which included obtaining a permit to bring the live ponies. On November 20, 2017, Mr. Yurgeau called the CPD at Mr. Supreme's direction and spoke to Officer John Doe. *See* Decl. of Yurgeau at ¶11. When Mr. Yurgeau inquired about obtaining a permit for the ponies, Officer John Doe told Mr. Yurgeau that he would need to call CAD to obtain a permit for the ponies. See *id.*

Mr. Yurgeau complied with Officer John Doe's direction and contacted the CAD to inquire about obtaining the needed permit for the ponies immediately afterwards. He left a message at CAD. See *Id.* On November 21, Eugene Blake ("Mr. Blake"), a Health and Licensing Officer with the CHLSD, called called

---

<http://nymag.com/selectall/2017/09/hillary-clinton-publishes-pony-facebook-post-in-new-book.html>.

RANDAZZA | LEGAL GROUP

Mr. Yurgeau back; Mr. Blake did not make it specify how he was associated with CAD.  *Id.*

Mr. Blake told Mr. Yurgeau that there were no general restrictions on having ponies outdoors at that location, and that ordinarily he would grant the permit to have the pony at that location.  See *id.*  However, Mr. Blake said that the CPD directed him not to grant a permit for the ponies on that day, and at that location, specifically because no one wanted to interfere with Mrs. Clinton's book signing. *See id.*

Mr. Blake mentioned that the CPD mentioned something about coordinating with the Secret Service, given Mrs. Clinton's status as the former First Lady she would be accompanied by them.  *See id.*

Mr. Blake said that Mr. Yurgeau could obtain a permit to have the live ponies at that location on another date or time, but noted specifically that Mr. Yurgeau could not have a permit to bring the live ponies outside of Mrs. Clinton's book signing.  *See id.*  Mr. Yurgeau attempted to negotiate with Mr. Blake, and asked him if there were any circumstances whereby he would grant the permit for the pony on the same date and location of the book signing. See *id.*

Mr. Blake refused, and said that he would not issue the permit on the date and location outside the bookstore under any circumstances.  *Id.*  Mr. Blake told Mr. Yurgeau that ponies would not be allowed, at the CPD's direction.  *Id.*

Given that Mrs. Clinton will likely only have a book signing of this particular book in the City of Concord once, and given that Mr. Supreme's groundswell of support is in New Hampshire, the ability to share his political speech at this protest is likely a once-in-a-lifetime opportunity.  Supreme Decl. at ¶¶18-20.

The ponies are symbols of Mr. Supreme's political speech.  Without them, the message will be lost if Mr. Supreme cannot obtain a permit or permission to

bring the ponies to the scheduled protest outside of the book signing on the public pathways on December 5, 2017.  The First Amendment will not abide such a loss of First Amendment rights.  *Id.*

## 3.0   STANDARDS FOR OBTAINING INJUNCTIVE RELIEF

In determining whether to issue preliminary injunctive relief, courts in the First Circuit are required to consider the following factors: "(1) whether plaintiffs are likely to succeed on the merits; (2) whether in the absence of injunctive relief plaintiff would suffer irreparable injury; (3) whether the balance of harms militates in favor of granting injunctive relief (that is, whether withholding injunctive relief will cause more harm to plaintiffs than granting injunctive relief will cause to defendants); and (4) whether the public interest lies in favor of granting or withholding injunctive relief under the circumstances." See *Silva v. Univ. of N.H.*, 888 F. Supp. 293, 297 (D.N.H. 1994).

When a violation of a constitutional right has been proven, however, no further showing of irreparable injury is required. See *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 2690 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (internal citations omitted); see also *Planned Parenthood v. City of Manchester*, 2001 DNH 83 LEXIS 6379, citing to *Elrod v. Burns, supra,* ("Absent injunctive relief, plaintiffs' protected constitutional rights would continue to be abridged and plaintiffs … will continue to suffer irreparable injury.")

## 4.0   ARGUMENT

### 4.1   Plaintiff Has Standing

"To qualify as a party with standing to litigate, a person must show, first and foremost, an invasion of a legally protected interest that is concrete and particularized and actual or imminent."  *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997). In the First Amendment context, a plaintiff has standing to

sue if a challenged governmental action operates to "chill" the plaintiff's exercise of his or her First Amendment Rights. See *Doe v. Bolton*, 410 U.S. 179, 188 (1973).

The constitutional minimum of standing contains three elements.  First, the plaintiff must have suffered an "injury in fact," an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not "conjectural" or "hypothetical."  Second, there must be a causal connection between the injury and the conduct complained of, the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.  Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 557 (1992).

Here, Plaintiff's harm is readily apparent.  Defendants have told Plaintiff that he is not allowed to engage in his expressive conduct and that he may not have a permit to have a pony at a political protest.  Plaintiff has suffered injury in fact because the Defendants have chilled his First Amendment rights by telling him not to bring a pony to the protest and denying him a permit to do so, which has interfered with his expressive rights protected by the First Amendment.  The threat is imminent since he will not have a permit to have his pony at the protest, he will likely be given a citation or arrested at the protest if he shows up without a permit. Last, an order from this Court compelling Defendants to issue the permit would vindicate Plaintiff, and he would not fear arrest for lawfully bringing a pony to the protest.

### 4.2    Plaintiff is Likely to Prevail on the Merits of His Free Speech Claims

Plaintiff's constitutional rights were violated by Defendants' actions, specifically by telling Plaintiff he could not engage in constitutionally protected free speech and petitioning activities and refusing to issue Mr. Supreme a permit to peacefully assemble and express his message.

### 4.2.1  Mr. Supreme's Activities Are Protected Under the First Amendment

Symbolic speech is no less protected than actual speech, and when a protester's conduct is sufficiently imbued with elements of communication to implicate the First Amendment, such as in the culmination of a political demonstration, then the symbolic speech requires First Amendment scrutiny.  *See Texas v. Johnson*, 491 U.S. 397, 399 (1989). Suspicion that viewpoint discrimination is afoot is at its zenith when the speech restricted is speech critical of the government, because there is a strong risk that the government will act to censor ideas that oppose its own.  *See Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 86 (1st Cir. 2004), citing to *Texas v. Johnson*, supra (striking down criminal flag desecration statute; flag-burner's action expressed "dissatisfaction with the policies of this country," expression which was "situated at the core of our First Amendment values," and state had no power to "prescribe what shall be orthodox" quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642, 87 L. Ed. 1628, 63 S. Ct. 1178 (1943) (internal quotation marks omitted)).

Here, the fact that Mr. Supreme wanted to use a live pony as symbolic speech to criticize a career politician like Mrs. Clinton is exactly the type of speech the Supreme Court reflected on in *Texas v. Johnson.*  Mr. Supreme wished to use symbolic speech (a live pony, rather than burning a flag) to criticize government policy, such as the types of government policies Mrs. Clinton referred to in her book in the passage about free ponies.

Similarly, it is not up to the government to decide what type of speech is orthodox, and while using a live pony as symbolic speech may be unorthodox, Mr. Supreme wishes to bring the live pony or ponies as an exercise of his First Amendment rights.  Denying the permit because the Defendants apparently prefer Mrs. Clinton's speech to Mr. Supreme's shows that viewpoint discrimination

was afoot.  When Defendant's denied Mr. Supreme's permit, their actions were unconstitutional, and clearly so.

The place where Mr. Supreme wished to engage in his symbolic speech must also be considered.  Government actions that infringe upon free speech in a public forum are evaluated under strict scrutiny if they are content-based. *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 76 (1st Cir. 2004).  The U.S. Supreme Court has repeatedly pronounced that a public side walk is a traditional public forum. See *Frisby v. Schultz*, 487 U.S. 474, 480, 108 S. Ct. 2495, 2500 (1988).  "[T]ime out of mind" public streets and sidewalks have been used for public assembly and debate, the hallmarks of a traditional public forum.  *Frisby v. Schultz*, 487 U.S. 474, 480 (1988); *see also Hills v. Scottsdale Unified Sch. Dist.*, 329 F.3d 1044, 1046 (9th Cir. 2003)("In a traditional public forum, such as a park or side-walk, restrictions on speech are subject to strict scrutiny and regulations must be narrowly drawn to achieve a compelling state interest."); *see also Grove v. City of York*, 342 F. Supp. 2d 291, 295 (M.D. Pa. 2004)("In a traditional public forum, such as streets, parks and public sidewalks, which have long been considered places for public assembly and the communication of ideas, the government may only impose reasonable restrictions on the time, place and manner of protected speech.")

Where the government has generally opened a place to the public any restrictions on speech are judged by the same standards as a traditional public forum.  *See Widmar v. Vincent*, 454 U.S. 263, 267-68 (1981).  In these circumstances, the government "must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end" if the restriction is content-based.  *Id.* at 270.  If the restriction is a content-neutral time, place, and manner restriction, the government cannot delegate overly broad discretion to a government official.  The regulation must be narrowly

tailored to serve a substantial governmental interest, and it must leave open ample alternatives for communication. *See Rideout v. Gardner*, 838 F.3d 65, 71 (1st Cir. 2016); citing to *Ward v. Rock Against Racism*, 491 U.S. 781, 791(1989).

Here, Plaintiff wishes to engage in constitutionally protected free speech on a public pathway, *outside* of a bookstore (not inside), thus the pathway is a traditional public forum. Even if Mr. Supreme were to have the ponies slightly away from the pathway, as long as the land has been generally opened to the public, then it will be analyzed as a public forum. Here, Mr. Supreme only wishes to engage in his expressive protest outside, near the book store, on public land.

The Defendants indicated that there are no issues with obtaining a permit to have a pony or two on this public pathway generally, but refused to allow Mr. Supreme to obtain a permit to have the pony on this day, indicating that the book signing was the reason for denying the permit. The Defendant's actions here were unconstitutional because they deny Mr. Supreme his fundamental right of engaging in symbolic speech, in an act of political protest, in a public forum. The Defendants must be compelled to issue Mr. Supreme a permit, or enjoined from taking action against Mr. Supreme if he brings a live pony to the protest.

### 4.2.2  Defendants' Actions Are an Unconstitutional Prior Restraint

"Prior restraints on speech and publication are the most serious and the least tolerable infringements on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 530, 559 (1976). The principle that "the Supreme Court has roundly rejected prior restraint" a fixed star in our constitutional constellation. *See Kinney v. Barnes*, 443 S.W.3d 87, 91 n.7 (Tex. 2014) (quoting Walter Sobchak, *The Big Lebowski* (PolyGram Filmed Entertainment & Working title Films 1998)). Prior restraints are not *per se* unconstitutional, but they "bear a heavy presumption

against [their] constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963).

There are two kinds of prior restraints in the free speech context: those that authorize a licensor to pass judgment of speech and those whose purpose is not to exclude communication of a particular content, but to coordinate multiple uses of limited space on a content-neutral basis. *See Thomas v. Chi. Park Dist.*, 534 U.S. 316, 322 (2002). "A licensing system need not effect total suppression in order to create a prior restraint on free speech." *See Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 547 (1975).

There is no reason here to think that the restriction here is anything other than content-based. Plaintiff sought to engage in political speech on a public sidewalk. Defendants told Plaintiff that he cannot express his message on the public sidewalk specifically because of proximity to a building where Mrs. Clinton's will be signing copies of her book – the very event Plaintiff wishes to protest.

Defendants simply decided that they did not want Mr. Supreme to engage in his activism on the public sidewalk. They have no discretion to engage in this form of censorship. Even if this discretion was legislatively delegated to Defendants, it would be improper. However, for Defendants simply take it upon themselves to be the sole source of authority that no permit, under any circumstances, would be issued to Plaintiff, is beyond the pale. Defendants told Plaintiff that there was no way for him to obtain the permit that specific day, meaning his only option was to have the protest on another day. This was not a narrowly tailored resolution, and did not provide adequate alternatives for communication.

Holding the protest on another irrelevant and arbitrary day is not narrowly tailored to serve any, much less a significant public interest. Holding the protest

on an arbitrarily chosen day and time would render Mr. Supreme's public participation meaningless, and does not leave open adequate or ample alternative channels for communication.   For Defendants to determine that Mr. Supreme may not protest Mrs. Clinton's event on a public sidewalk outside using a peaceful expression such as standing with even a single pony, delegates far too much discretion to the Defendants.

Regulatory schemes that require licensing before a person may engage in protected speech are only permitted where "there are procedural safeguards that ensure that the decision-maker approving the speech does not have 'unfettered discretion' to grant or deny permission to speak."   *Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795 (7th Cir. 2016).   "At the root of this long line of precedent is the time-tested knowledge that in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." *Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757 (1988).  The fact that one person may, without any checks or balances, impose a prior restraint "intimidates parties into censoring their own speech, even if the discretion and power are never actually abused." *Id.*

There are two issues in play here.  First, Defendants claim that Mr. Supreme must obtain a permit if he wants to have a pony outside, which is a regulation that Mr. Supreme must comply with in order to express his opinion about Mrs. Clinton's discussion of his policies.  This is a prior restraint and conditions his speech on Defendant's willingness to license or permit his speech. There does not even appear to be a licensing "scheme" in place since Defendants apparently have unfettered discretion regarding when and where they will issue a permit, and apparently not wanting to bother a politician at a book signing is

enough of a reason to not give a citizen a permit to protest that politician.  There was no system in place here, no standards, and no procedure.

The effect of Defendants denial is permanent, because Mrs. Clinton will probably not have another book signing of this exact book in Concord, New Hampshire.  Once Plaintiff's opportunity is gone, it will be gone for good, and the effect of their denial is to prevent him from engaging in his political speech activities. There are no exceptions to their edict.  This is impermissible under the U.S. and New Hampshire Constitutions, and Mr. Supreme will prevail on his claims.

### 4.2.3   Defendants' Restrictions on Speech Are Not Reasonable Time, Place, and Manner Restrictions

Even if the Court were to overlook the fact that Defendants' restrictions are prior restraints based on the content of speech, they must fall because they are not reasonable time, place, and manner restrictions.   Although restrictions on speech are disfavored, a government may issue reasonable regulations governing the time, place, or manner of speech. *Ward v. Rock Against Racism*, 491 U.S. 781, 802-03 (1989).  For time, place, and manner restrictions to be valid they must not delegate overly broad discretion to a government official, must be narrowly tailored to serve a substantial governmental interest, and must leave open ample alternatives for communication.  *Id.*  Defendant's decision to deny Mr. Supreme's request for a permit so that Mr. Supreme could engage in his activism was not even thought out – much less thought out so that it would be narrowly tailored.  It served no governmental interest at all, and burdened more speech than was necessary.

For a time, place, and manner restriction to be narrowly tailored it must further a substantial government interest.  *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Jesus*, 634 F.3d 3, 11 (1st Cir. 2011); *see also Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293, 104 S. Ct. 3065, 3069 (1984).  Defendants decided that

Plaintiff could not engage in his speech because it conflicted with Mrs. Clinton's book signing, the very event that Plaintiff wished to protest, and told Plaintiff that he could obtain a permit to have the pony any other day besides the day of Mrs. Clinton's book signing, a decision that renders his speech completely impotent.

This arbitrary decision served no governmental interest at all, much less a substantial one.  The burden is on Defendants to provide "concrete evidence" the restriction furthers the government's claimed substantial interest.  *See Jews for Jesus v. Mass. Bay Transp. Auth.*, 984 F.2d 1319, 1324 (1st Cir. 1993); *see also Weinberg v. City of Chicago,* 310 F.3d 1029, 1038 (7th Cir. 2002)("In the context of a First Amendment challenge under the narrowly tailored test, the government has the burden of showing that there is evidence supporting its proffered justification."); *see also Lim v. City of Long Beach*, 217 F.3d 1050, 1054 (9th Cir. 2000) (holding that burden is on the state to prove restriction is necessary).

"Security is not a talisman that the government may invoke to justify any burden on speech (no matter how oppressive)." *Watchtower Bible & Tract Soc'y of N.Y., Inc v. Jesus*, 634 F.3d 3, 6 (1st Cir. 2011).   Narrow tailoring, "forbids burdening substantially more speech than necessary, (and) may require reasonable tempering at the application stage." *Id.*

Here, Defendants did not cite any, much less a "substantial" security risk as the reason why one or two live ponies could not be brought to the protest on the public sidewalk.  They alluded to this risk when Defendant Blake mentioned that the police would not allow it because of the Secret Service – but did not share any further details.  Defendants cannot not conceivably come up with a reason why a not even a single live pony cannot be permitted under any circumstances at the protest of Mrs. Clinton's live book signing.  To the best of the Plaintiff's knowledge, no pony has ever attacked an American politician – and

RANDAZZA | LEGAL GROUP

presumably the Secret Service would be able to intervene, should Mr. Supreme try and find some way to break that drought in pony-on-politician violence.

Could Mr. Supreme stand at a certain distance with the pony? Or could Mr. Supreme obtain a "free speech zone stable" that could contain these ponies, which the government apparently fears?  No other options were considered, Defendants stated that the ponies would not be allowed under any circumstances near Mrs. Clinton's book signing, and that Mr. Supreme would need to obtain the permit a different day. Neither Mr. Supreme nor a single pony poses a threat to Mrs. Clinton, and Mrs. Clinton herself stated in her book that she likes ponies (after all, even Ms. Clinton is not so tone deaf as to express a dislike for ponies).  Here, Defendants cannot meet their burden.

Even if there were a substantial government interest in limiting Mr. Supreme's speech, there is no justification for the extent to which Defendants restricted it.  An alternative form of communication is not "ample" if it does not allow the party to reach its desired audience.  *See Berger v. City of Seattle*, 569 F.3d 1029, 1049 (9th Cir. 2009).  While the government does not have to use the least restrictive means available under these circumstances, not allowing Mr. Supreme's expressive speech at all that day at the protest, under any circumstances, is the opposite of ample, because Mr. Supreme's message would be meaningless any other day.

Mr. Supreme cannot show up to the protest with a pony at all next Tuesday. Not allowing him to attend the outdoor protest with a pony is not the least restrictive means.  This is a ban on his speech.  Mr. Supreme's speech would be meaningless on any other day, just as singing happy birthday to someone on the wrong day would be meaningless.  Defendant's denial does not leave open ample alternative channels of communication and does not achieve any

conceivable government interest.  Under no legal standard are the restrictions narrowly tailored.

### 4.3     Defendants' Activities Violate Mr. Supreme's Due Process Rights

Procedural due process under the Fourteenth Amendment is meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property.  *Carey v. Piphus*, 435 U.S. 247, 248 (1978). The constitutional guarantee of due process requires that a purpose of procedural due process is to convey to the individual a feeling that the government has dealt with him fairly, as well as to minimize the risk of mistaken deprivations of protected interests.  *Id.*  Here, Mr. Supreme sought to obtain a permit on a certain date to have a pony at a protest of Mrs. Clinton's book signing.  Defendants denied the permit, and stated that the permit would not be granted on that day under any circumstances.  Defendants did not provide a procedure they followed to come to this decision, nor did they provide an administrative appeal process for Plaintiff.  Accordingly, Plaintiff's due process rights guaranteed under the Constitution have been violated.

### 4.4     Without Injunctive Relief, Mr. Supreme Will Continue to Suffer Irreparable Harm

As stated above, the Court must consider whether in the absence of injunctive relief plaintiff would suffer irreparable injury, whether the balance of harms militates in favor of granting injunctive relief, and whether the public interest lies in favor of granting or withholding relief.  *See Silva* supra.  Here, Mr. Supreme fits all the criteria.  As discussed above, he has a high probability of prevailing on the merits. It is well established that "the loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Silva* 888 F. Supp. at 326, citing to *Elrod v. Burns*, 427 U.S. 347,

373 (1976).  Thus, a likelihood of success on a First Amendment claim will likely satisfy all four preliminary injunction factors.  *Id.*

The harm is especially significant here, Mr. Supreme will suffer irreparable injury, because he will have lost his First Amendment right to protest and petition Mrs. Clinton's position as a politician on his campaign.  The Defendant's denial of the permit restricts Mr. Supreme's First Amendment activity.  Mrs. Clinton's book "What Happened" specifically criticizes his campaign's platform of socialized distribution of ponies to every American.   Mr. Supreme has his biggest groundswell of support in New Hampshire.  It is unlikely that Mrs. Clinton will ever have another book signing of this specific book in New Hampshire ever again, so once the book signing is over, Mr. Supreme's opportunity to protest Mrs. Clinton in the state that has given him the most political support will be lost forever. Mr. Supreme's irreparable harm is exacerbated by the short duration of this once-in-a-lifetime event.

On balance, the harm militates in favor of granting injunctive relief because Mr. Supreme's fundamental rights, protected by the U.S. and New Hampshire Constitutions, are at stake.  This means that withholding injunctive relief will cause more harm to Mr. Supreme than granting injunctive relief will cause to Defendants because his fundamental rights will be denied.

Defendants cannot claim any hardship.  Furthermore, since Defendant's denial is unconstitutional, there is no harm in compelling them to issue the permit. The lack of damage that would occur if injunctive relief were granted obviously cannot compare with the irreparable harm Mr. Supreme suffers, because his constitutional rights are at stake.

Last, the public interest in this matter is best served by the protection of Mr. Supreme's constitutional rights.  *Id.*  Our constitutional rights are our freedoms, reserved by the people; not rights granted to us.  This concept is enshrined in the

hearts of the people of New Hampshire, the Live Free or Die State, and to deny Mr. Supreme one of his fundamental freedoms – his freedom of expression – would not serve the public interest.

**5.0    CONCLUSION**

For the foregoing reasons, Mr. Supreme respectfully requests that the Court provide injunctive relief and compel Defendants to issue Mr. Supreme the requested permit and/or enjoin Defendants from preventing Mr. Supreme from engaging in activities protected under the First Amendment.

Dated: December 1, 2017.                    Respectfully submitted,

/s/ Arpiar M. Saunders
Arpiar M. Saunders
(NH Bar No. 265178)
SAUNDERS & SILVERSTEIN LLP
14 Cedar Street, Suite 224
Amesbury, MA 01913
Tel:   978-463-9100
Fax:  978-463-9109
Email: msaunders@sandsip.com

Marc J. Randazza
*Pro Hac Vice* forthcoming
RANDAZZA LEGAL GROUP, PLLC
4035 S. El Capitan Way
Las Vegas, NV 89147
Tel: 702-420-2001
Fax: 305-437-7662
Email: ecf@randazza.com

RANDAZZA | LEGAL GROUP